AUSAs: Shiva H. Logarajah/Jennifer N. Ong

**23 MAG 6652**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>WILSON DANIEL FREITA DA COSTA,<br>  a/k/a, "Wilson Costa,"<br>  a/k/a, "Wilson Dakosta,"<br>  a/k/a, "Watson Bisong,"<br>  a/k/a, "Watson Bisong Dacosta,"<br><br>                    Defendant. | **SEALED COMPLAINT**<br><br>Violations of 18 U.S.C. §§ 1028A,<br>1343 and 2<br><br>COUNTY OF OFFENSE:<br>NEW YORK |

SOUTHERN DISTRICT OF NEW YORK, ss.:

JOSEPH LoBIONDO, being duly sworn, deposes and says that he is a Special Agent with the U.S. Department of Homeland Security, Homeland Security Investigations ("HSI"), and charges as follows:

## COUNT ONE
**(Wire Fraud)**

1.     From at least in or about August 2017 through at least in or about 2019, in the Southern District of New York and elsewhere, WILSON DANIEL FREITA DA COSTA, a/k/a "Wilson Costa," a/k/a, "Wilson Dakosta," a/k/a, "Watson Bisong," a/k/a, "Watson Bisong Dacosta," the defendant, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, DA COSTA, in his capacity and within the scope of his duties as a senior executive for a New York Stock Exchange ("NYSE")-traded U.S. multinational corporation ("Company-1"), forged documentation purportedly from officials of a foreign country ("Country-1") to fraudulently obtain money and property from Country-1, in part to benefit Company-1, and caused wires to be sent to and from the Southern District of New York and elsewhere, in furtherance of that scheme.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT TWO
**(Aggravated Identity Theft)**

2.     From at least in or about August 2017 through at least in or about 2019, in the Southern District of New York and elsewhere, WILSON DANIEL FREITA DA COSTA, a/k/a "Wilson Costa," a/k/a, "Wilson Dakosta," a/k/a, "Watson Bisong," a/k/a, "Watson Bisong Dacosta," the defendant, knowingly transferred, possessed, and used, without lawful authority, a

means of identification of another person, during and in relation to a felony violation enumerated in Title 18, United States Code, Section 1028A(c), to wit, DA COSTA used and transferred the name and title of government officials from Country-1 during and in relation to the wire fraud violation charged in Count One of this Complaint.

(Title 18, United States Code, Sections 1028A(a)(1), 1028A(b), and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

3.  I am an HSI Special Agent and am currently assigned to the El Dorado Task Force of HSI's New York Field Office, which investigates, among other things, money laundering and financial crime. During my time with the HSI, I have participated in investigations of money laundering, wire fraud, bank fraud, corruption, and extortion.

4.  This affidavit is based upon my participation in the investigation of this matter, including my conversations with law enforcement agents and other individuals, my review of law enforcement reports and records, business records from two companies ("Company-1," as defined above, and "Company-2"), open source materials, including publicly filed documents in federal and international courts, and filings with the Securities and Exchange Commission ("SEC"), and my review of other business records, financial records, phone records, electronic communications, and draft summaries and translations of certain of such documents, communications, and messages. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated. Where figures, calculations, and dates are set forth herein, they are approximate, unless stated otherwise.

## Overview

5.  As set forth in greater detail below, HSI is investigating a sophisticated fraud scheme perpetrated from in or about 2017 through at least in or about 2019 by, among others, WILSON DANIEL FREITA DA COSTA, a/k/a "Wilson Costa," a/k/a, "Wilson Dakosta," a/k/a, "Watson Bisong," a/k/a, "Watson Bisong Dacosta," the defendant, to fraudulently obtain money and property from Country-1 for himself and for Company-1. DA COSTA was previously employed by Company-1, a U.S.-based multinational business, from at least in or about 2011 through in or about 2019. In or about February 2018, DA COSTA was promoted to be the Chief Executive Officer ("CEO") of Company-1's operations in Country-1.

6.  In or about October 2017, WILSON DANIEL FREITA DA COSTA, a/k/a "Wilson Costa," a/k/a, "Wilson Dakosta," a/k/a, "Watson Bisong," a/k/a, "Watson Bisong Dacosta," the defendant, in his role as CEO for Company-1, created and disseminated fake documents (the "Fake Documents"), purportedly signed by officials of Country-1, but in fact forged by DA COSTA, to justify and support a bridge loan worth approximately $1.1 billion from Company-1 to Country-1 (the "Bridge Loan"). The Bridge Loan was extended, in large part, to allow Country-1 to purchase goods from Company-1. Company-1 envisioned immediately reducing the credit risk posed to its balance sheets by the Bridge Loan by securitizing, syndicating, or otherwise having others guarantee the Bridge Loan, including Export Credit Agencies ("ECAs") from countries where its

goods were manufactured. The precise quantity of Company-1's goods to be financed by the Bridge Loan (and therefore the value of Company-1's goods) was thus material to, among others, the ECAs and others who Company-1 envisioned dispersing the risk of the Bridge Loan to.

7. WILSON DANIEL FREITA DA COSTA, a/k/a "Wilson Costa," a/k/a, "Wilson Dakosta," a/k/a, "Watson Bisong," a/k/a, "Watson Bisong Dacosta," the defendant, created the Fake Documents to deceive Company-1 and the ECAs into believing that Country-1 had committed to purchasing more of Company-1's goods than it actually had. As the amounts and disbursements of the Bridge Loan turned at least in part on the amount of goods Country-1 had agreed to purchase from Company-1, the Fake Documents were critical to the disbursement of the Bridge Loan—which financed Country-1's purchase of Company-1's goods—as well as Company-1's efforts to disperse credit risk from the Bridge Loan.

8. Later, in or about December 2018, after questions were raised by Country-1 officials about the Fake Documents, WILSON DANIEL FREITA DA COSTA, a/k/a "Wilson Costa," a/k/a, "Wilson Dakosta," a/k/a, "Watson Bisong," a/k/a, "Watson Bisong Dacosta," the defendant, lied and made further efforts to cover up his involvement with the Fake Documents. Even after Country-1 officials raised these questions, including direct questions about DA COSTA's involvement in the Fake Documents and other forgeries, Company-1 relied on the Fake Documents as part of its continued efforts to maintain its business relationship with Country-1 at the expense of a former commercial partner in Country-1: Company-2.

## Background

9. I have learned the following, in substance and in part, about WILSON DANIEL FREITA DA COSTA, a/k/a "Wilson Costa," a/k/a, "Wilson Dakosta," a/k/a, "Watson Bisong," a/k/a, "Watson Bisong Dacosta, the defendant:

   a. In or about 1998 or 1999, DA COSTA filed an immigration application and affidavit (together, the "Immigration Application") with the U.S. Citizenship and Immigration Services ("USCIS"). In the Immigration Application, among other things, DA COSTA stated he spoke fluent English, and stated that he was a member of Country-1's armed forces.

   b. In or about 2007, DA COSTA filed an affidavit with USCIS to adjust his immigration status (the "2007 Affidavit"). The 2007 Affidavit contained statements that were inconsistent with the Immigration Application. For example, DA COSTA claimed to be fluent in English in his Immigration Application but then later claimed he did not cooperate with U.S. law enforcement after he was arrested in 2003 because he did not speak English.

   c. In or about June 2018, while employed by Company-1, DA COSTA filed an Application for Naturalization with USCIS (the "Naturalization Application"), which contained statements that were inconsistent with the Immigration Application. For example, DA COSTA answered "no" to questions related to whether he had been in the military or received military or weapons training despite previously claiming to have been a member of Country-1's armed forces.

3

    d. In his Naturalization Application, DA COSTA stated that he had not committed or attempted to commit a crime for which he was not arrested. As set forth in greater detail below, DA COSTA made this statement after he created the Fake Documents. *See infra* ¶¶ 18-21.

10. Company-1 and Company-2 have routinely done business in Country-1 since at least in or about 2013. In or about 2016, Company-1 and Company-2 signed an agreement, which gave Company-2 the exclusive right to market and sell certain Company-1 gas turbines (the "Turbines") in Country-1. Each Turbine, at that time and at all times relevant in this Complaint, was worth tens of millions of dollars.

11. Between in or about 2014 and in or about 2017, Company-2 and Country-1 entered into a series of contracts (collectively, the "Sales Contracts") for Country-1 to purchase eight Turbines from Company-2. Between in or about June 2016 and in or about 2017, Company-1 and Company-2 entered into a separate set of contracts (collectively, the "Supplier Contracts"), which, among, other things, governed the sale of twelve Turbines (with a potential for the sale of two additional Turbines) from Company-1 to Company-2 for Company-2 to sell to Country-1, among other countries. The Sales Contracts and Suppliers Contracts were not "back-to-back" contracts, or a single contractual mechanism, because the Sales Contracts contemplated the sale of eight Turbines to Country-1 specifically while the Supplier Contracts contemplated the sale of twelve Turbines (and potentially up to fourteen Turbines) from Company-1 to Company-2.

12. As set forth in more detail below, around the time that Company-1 and Company-2 entered into the first of the Supplier Contracts, WILSON DANIEL FREITA DA COSTA, a/k/a "Wilson Costa," a/k/a, "Wilson Dakosta," a/k/a, "Watson Bisong," a/k/a, "Watson Bisong Dacosta," the defendant, created a sham contract purportedly entered into with the Chief Executive Officer of Company-2 ("Company-2 CEO"):

    a. Specifically, on or about June 1, 2016, DA COSTA, through the company MAMFE Energy FZC ("MAMFE"), and Company-2 CEO, through a Dubai-based shell entity ("Entity-1"), entered into a side agreement for Entity-1 to pay MAMFE approximately $7.5 million U.S. dollars for the sale of services (the "Side Agreement").

    b. The Side Agreement listed the price for certain services called for in the agreement. As an example, the price for "Services for Field Engineering Services (300 Manweeks)" was listed as approximately $5.4 million U.S. dollars.

    c. Based on my review of business records, I have reason to believe that the Side Agreement was a fake contract used by DA COSTA and Company-2 CEO to make potential bribe payments from Company-2 CEO to DA COSTA appear legitimate. For example, the Side Agreement contains a Company-1 contract number, but that number in reality reflects a contract between Company-1 and another company located in Asia (the "Asia Company")—*i.e.*, not MAMFE or Entity-1.

    d. I further have reason to believe that the Side Agreement was a fake contact because it contains a reference to the country in Asia where the Asia Company is located.

13.     On or about August 21, 2017, Company-1 and Country-1 signed an agreement (the "Bridge Loan Agreement") governing the Bridge Loan from Company-1 to Country-1. While the Bridge Loan was being extended by Company-1, the Bridge Loan Agreement itself contemplated financing the Sales Contracts, which were executed between Company-2 and Country-1.  The Bridge Loan Agreement was predicated, in material part, on the misunderstanding that Country-1 would purchase twelve Turbines from Company-2 even though Country-1 in truth only agreed to purchase eight Turbines from Company-2 in the Sales Contracts. Company-1's Bridge Loan, therefore, was premised on the understanding that Country-1 would purchase twelve Turbines while the Sales Contracts—which contained what Country-1 agreed to purchase—only contained eight Turbines (the "Turbine Gap").

### DA COSTA Creates the Fake Documents

14.     On or about August 31, 2017, following entry of the Supplier Contracts and Sales Contracts, a Company-1 official ("Official-1"), who was responsible for the Company-1 component that marketed and sold the Turbines, messaged Company-2 CEO that Company-1 "need[ed] help on the unit count . . . it's a big item for us [Company-1]" and that "[t]he issue is we can't pay out the loan"—referring to the  Bridge Loan—if twelve Turbines were not part of the Sales Contracts. A week earlier, WILSON DANIEL FREITA DA COSTA, a/k/a "Wilson Costa," a/k/a, "Wilson Dakosta," a/k/a, "Watson Bisong," a/k/a, "Watson Bisong Dacosta," the defendant, messaged Company-2 CEO that another Company-1 executive based in the United States "just called me [DA COSTA] maybe I am out of [Company-1]" because of the Turbine Gap and that Company-1 personnel had "requested to suspend [DA COSTA's] [Company-1] email to check everything." Based on my training, experience, and involvement in this investigation, I believe DA COSTA was relaying to Company-2 CEO that he feared for his job at Company-1 due to the Turbine Gap.  Further, based on my training, experience, and involvement in this investigation, I believe that the above exchanges reflect Company-1's (and DA COSTA's) apprehension that the Bridge Loan, which was the only way Country-1 could purchase the Turbines, would be unable to operate if the Turbine Gap was left unaddressed.

15.     In or about September 2017, Official-1 and other Company-1 personnel involved with the Bridge Loan met with Company-2 executives. After the meeting, Official-1 emailed Company-2 CEO about, among other things, the "outcome of [their] meeting."  In sum and substance, Official-1 noted that the Bridge Loan could not operate as originally designed if the Turbine Gap was not addressed by amending the Sales Contracts to reflect that Country-1 agreed to purchase twelve Turbines.

16.     Because the Sales Contracts were contracts between Company-2 and Country-1, executives at Company-2 were primarily responsible for procuring amendment letters from Country-1 to address the Turbine Gap and to bring the overall number of Turbines covered by the Sales Contracts to twelve.

17.     On or about October 12, 2017, Country-1 provided three letters to personnel from Company-1 and Company-2 reflecting Country-1's non-binding interest in purchasing four more Turbines (the "Country-1 Letters").  Based on my involvement in this investigation and the evidence described above, I have reason to believe that the Country-1 Letters would not suffice to address the Turbine Gap because they were non-binding.

18. The same day, on or about October 12, 2017, WILSON DANIEL FREITA DA COSTA, a/k/a "Wilson Costa," a/k/a, "Wilson Dakosta," a/k/a, "Watson Bisong," a/k/a, "Watson Bisong Dacosta," the defendant, altered the Country-1 Letters using a software program (the "Forged Letters"). Two of the Forged Letters were on letterhead from a Country-1 agency and was purportedly signed by the chairman of the board of directors of that agency. The third Forged Letter was on letterhead from a different Country-1 agency and was purportedly signed by the chairman of the board of directors of that agency. The Forged Letters purportedly showed Country-1's definite commitment to purchasing four more Turbines under the Sales Contracts which, as described above, was necessary for the Bridge Loan to operate. I have reason to believe the Forged Letters were altered using a particular software program based on my review of the metadata associated with the Forged Letters. Additionally, I further have reason to believe DA COSTA played a role in creating the Forged Letters because DA COSTA (a) used his Company-1 email account to send the Forged Letters to the Chief Development Officer at Company-2 ( "Company-2 CDO") who was not based in Country-1 and who otherwise was not involved in negotiations with Country-1 regarding the Turbine Gap; and (b) later forwarded the email he sent to Company-2 CDO to his Company-1 email account.

19. Approximately an hour later, on or about October 12, 2017, WILSON DANIEL FREITA DA COSTA, a/k/a "Wilson Costa," a/k/a, "Wilson Dakosta," a/k/a, "Watson Bisong," a/k/a, "Watson Bisong Dacosta," the defendant, emailed another version of the Forged Letters to Official-1 and others at Company-1; these versions, unlike the versions described in paragraph 18, *supra*, showed that Company-2 CDO had signed the Forged Letters (the "Signed Forged Letters" and together with the Forged Letters, the "Fake Documents," *see supra* paragraph 6), and were only circulated internally at Company-1 as photo files (or ".jpeg" files)—as opposed to document attachments (such as a PDF or Word file).

20. Based on my investigation to date, including my review of publicly filed documents in court and my conversations with others with knowledge of these events, I know that Company-2 CDO has strenuously denied signing the Signed Forged Letters, and, to date, I have not seen any evidence of Company-2 CDO actually sending the Signed Forged Letters back to WILSON DANIEL FREITA DA COSTA, a/k/a "Wilson Costa," a/k/a, "Wilson Dakosta," a/k/a, "Watson Bisong," a/k/a, "Watson Bisong Dacosta," the defendant. Moreover, the fact that DA COSTA included no personnel from Company-2—who could have easily discerned whether or not the Company-2 CDO actually signed the letters—on correspondence regarding the Signed Forged Letters further gives cause to believe that Company-2 CDO did not actually sign the Signed Forged Letters.

21. Based in part on the Signed Forged Letters that WILSON DANIEL FREITA DA COSTA, a/k/a "Wilson Costa," a/k/a, "Wilson Dakosta," a/k/a, "Watson Bisong," a/k/a, "Watson Bisong Dacosta," the defendant, circulated to Company-1, the Bridge Loan disbursed a total of approximately $644 million U.S. dollars pursuant to the Agreement in or about December 2017 and in or about January 2018. I know that at least some of the payments made through the Bridge Loan, including two wires for a total of approximately $95 million U.S. dollars, were paid into accounts located in the Southern District of New York.

22. On or about December 29, 2017, the day after approximately $514 million U.S. dollars from the Bridge Loan was disbursed and the same day that approximately $90 million U.S. dollars from the Bridge Loan was disbursed, MAMFE issued an invoice to Entity-1 requesting a

total of approximately $5,040,000 U.S. dollars for "Consultant Services for Power Generation projects in [Country-1]" and two other countries, and the "Supply of Manpower to perform services for Power Generation and services over 2 years." Initially, WILSON DANIEL FREITA DA COSTA, a/k/a "Wilson Costa," a/k/a, "Wilson Dakosta," a/k/a, "Watson Bisong," a/k/a, "Watson Bisong Dacosta," the defendant, sent the invoice from DA COSTA's personal email address to Company-2 CEO's email address with Company-2. Company-2 CEO promptly responded: "Wrong address I don't [k]now what is this." Approximately five minutes later, DA COSTA redirected the invoice to Company-2 CEO's personal email address. Based on my participation in this investigation, the fact that the Side Agreement appears to be a fake contract, *see supra* ¶ 12, the fact that this invoice is inconsistent with the Side Agreement's payment schedule, the fact that Company-2 CEO denied knowing what the invoice was when DA COSTA sent it to his Company-2 email account, and the fact that DA COSTA sent the invoice to Company-2 CEO after the Bridge Loan disbursed more than $600 million U.S. dollars, I believe DA COSTA illicitly steered a portion of the Bridge Loan for his own personal gain, and that the Side Agreement was a cover for this illicit arrangement.

### **Company-1 Uses the Fake Documents**

23. In or about August 2018, Country-1 officials made clear to personnel at Company-1 and Company-2 that they did not expect to purchase four more Turbines. However, in October 2018, Country-1's position changed and Country-1 officials showed a willingness to reduce the scope of other services in the Sales Contracts in order to potentially purchase four more Turbines.

24. In or about December 2018, representatives from Company-1, Company-2, and Country-1 met on multiple occasions to discuss the Sales Contracts:

   a. On or about December 5, 2018, WILSON DANIEL FREITA DA COSTA, a/k/a "Wilson Costa," a/k/a, "Wilson Dakosta," a/k/a, "Watson Bisong," a/k/a, "Watson Bisong Dacosta," the defendant, on behalf of Company-1, Company-2 representatives, and Country-1 representatives met to discuss reducing services in the Sales Contracts to allow for the purchase of four additionally Turbines. DA COSTA, consistent with the Fake Documents but inconsistent with the Sales Contracts, noted that Company-1 had already financed the four additional Turbines through the Bridge Loan.

   b. That same day, DA COSTA forwarded the October 2017 emails he sent to Company-2 CDO containing the Forged Letters to himself at his Company-1 email address. I have reason to believe DA COSTA re-forwarded the Forged Letters to his Company-1 email address so that he could use or show them, as further discussed below.

   c. On or about December 7, 2018, Company-2, DA COSTA, on behalf of Company-1, and Country-1 officials again met to discuss potentially amending the Sales Contracts. A few days later, on or about December 11, 2018, Country-1 sent a letter to a Company-1 official ("Official-2") requesting a meeting based on a "serious irregularity" with respect to "4 [Turbines]" which the "CEO . . . Mr. Wilson da Costa" had "confirm[ed] . . . were acquired with recourse to the credit granted by [Company-1] to [Country-1]." According to this letter, Country-1

7

viewed this as an irregularity because those four Turbines had "not been requested and no addendum or valid document has been issued which would justify changing the scope of the [Sales Contracts] and the prices."

d. Between on or about December 18 and December 20, 2018, DA COSTA and Official-2 met with the Country-1's Minister of Energy. Representatives of Company-2 were not present at the meeting. Following the meeting, on or about December 20, 2018, Official-2 sent an internal email and noted: "[DA COSTA] and I had a meeting with the Minister of Energy in Country-1 this week where we clarified the 12 [Turbines] that been funded as part of the [Bridge Loan]."

e. Based on my review of messages described below, I believe that DA COSTA used the December 20, 2018 meeting with the Country-1 Minister of Energy to ascribe blame to Company-2 for the Turbine Gap by accusing Company-2 of "double billing." In messages between DA COSTA and a Company-1 official ("Official-3") on or about December 19, 2018, I know that DA COSTA told Official-3 that "[Company-2] put us in a very difficult position . . . when they went and claimed that we only finance 8 [Turbines.] The minister called us to the meeting and we made it very clear that [Country-1] finances 12 [Turbines]. The government minister and every got really [a]ngry with [Company-2] and the[ir] relationship with the government has only gotten worse."  DA COSTA continued and messaged Official-3 that "[t]he minister is now very angry and is in the process of terminating [Company-2's] contracts." Based on my training, experience, and involvement in this investigation, I believe DA COSTA wholly blamed Company-2 for double billing Country-1 during this meeting in (1) an effort to stave off any scrutiny of the Fake Documents and thus conceal his role in their creation and dissemination, and (2) to ensure that the Bridge Loan (which had already made a disbursement) was not impacted.

**Company-1 Attempts to Forge a Direct Commercial Relationship With Country-1 And Uses the Signed Forged Letters In That Process**

25. On or about January 10, 2019, Company-2 received a notice from Country-1 that the Sales Contracts were being terminated.

26. On or about January 28, 2019, in an email to another Company-1 executive, Official-2 noted that Country-1 wished to transfer Company-2's responsibilities to Company-1. That same day, a Company-1 lawyer circulated to WILSON DANIEL FREITA DA COSTA, , a/k/a "Wilson Costa," a/k/a, "Wilson Dakosta," a/k/a, "Watson Bisong," a/k/a, "Watson Bisong Dacosta," the defendant, and Official-1, among others, copies of the Signed Forged Letters which DA COSTA had originally circulated in October 2017 and noted Company-1's intention to "forward" to Country-1.  DA COSTA then, three days later, forwarded the Company-1 lawyer's email (which contained the Signed Forged Letters) to his then-wife's personal email address.

27. By in or about May 2019, Country-1 had officially communicated their intention to transfer the existing Sales Contracts away from Company-2 to Company-1. In or about October 2019, Official-2 sent the Country-1 Minister of Energy a letter where he noted that Company-1 "would like to thank you for the opportunity to meet once again with you and your team to discuss

the key actions aiming at establishing a direct contractual relation between [Country-1] and [Company-1]."

28. On or about September 5, 2019, Company-1 sent, through official channels, copies of the Signed Forged Letters, which, based on my observation of them, appear to be larger, or blown up, versions of the photographs WILSON DANIEL FREITA DA COSTA, a/k/a "Wilson Costa," a/k/a, "Wilson Dakosta," a/k/a, "Watson Bisong," a/k/a, "Watson Bisong Dacosta," the defendant, had circulated earlier. The Signed Forged Letters were sent with a cover letter to a senior official in Country-1's Ministry of Energy and Water. Three days earlier, on or about September 2, 2019, Country-1 terminated the Sales Contracts.

WHEREFORE, I respectfully request that a warrant be issued for the arrest of WILSON DANIEL FREITA DA COSTA, a/k/a "Wilson Costa," a/k/a, "Wilson Dakosta," a/k/a, "Watson Bisong," a/k/a, "Watson Bisong Dacosta," the defendant, and that he be arrested, and imprisoned or bailed, as the case may be.

/s/ Joseph LoBiondo, by SDA with permission
_____
JOSEPH LoBIONDO
Special Agent
U.S. Department of Homeland Security, Homeland Security Investigations

Sworn to me through the transmission of
this Complaint by reliable electronic
means (telephone), this 3rd day of October, 2023.

*[signature]*
_____
THE HONORABLE STEWART D. AARON
United States Magistrate Judge
Southern District of New York